ARNDT BROTHERS MINKERY, Copartnership, Respondent, vs. MEDFORD FUR FOODS, INC., Appellant.

*January 8—February 5, 1957.*

For the appellant there was a brief and oral argument by *Edward T. O'Neill* of Fond du Lac.

For the respondent there was a brief and oral argument by *Clifford L. Curran* of Medford.

MARTIN, C. J. Ernest and Gerald Arndt are mink ranchers. Defendant is a processor and seller of horse meat, fish, and allied products used as food for mink. The plaintiff partnership had bought mink food from the defendant for about four years.

Defendant's manager, Ed Amacher, testified as follows with respect to its procedures of processing and handling the food. Horses are slaughtered and the carcasses kept in a chillroom, temperature 30 to 32 degrees, until the next day. In the morning they are taken out, split into smaller pieces, and ground. The tripe is cut open, washed, and kept in a barrel in cold water until ground up the same day the horses are slaughtered; what is left is put into the sharp freeze and is frozen into a solid block by the next morning. Defendant purchases pork livers in frozen blocks hauled to its plant in refrigerated trucks. Upon arrival they are placed in the freezer until needed. The night before they are intended to

be used they are set out on the chopping table until about 7 a. m. when they are ground. Mr. Amacher testified:

"*Q*. Now, you have no knowledge as to what the condition of those pork livers would be before you got them, have you? *A*. No.

"*Q*. You don't know how they were handled prior to that time? *A*. No, sir.

"*Q*. You don't know whether they were left in a frozen or unfrozen state, do you? *A*. No, sir."

Beef tripe and fish obtained in frozen form are similarly received and handled. The various items are ground by defendant separately and whatever is not needed for its customers is put back into the sharp freeze. In the process of grinding, anything that does not look right is thrown out, but the witness admitted it would be possible for something like that to slip by. If any of the ground food is left out for more than a day it is thrown away.

In August of 1954, plaintiff had 1,217 mink on its ranch, of which 807 were kits born in May of that year. Between 7:30 and 8 a. m. on August 7th plaintiff placed an order with the defendant for 169 pounds of horse meat, 64 pounds of fish, 42 pounds of liver, and 22 pounds of tripe. About 11 a. m. an employee of plaintiff drove to the defendant's place of business and loaded the food into the truck, using separate pans provided by plaintiff for each of the different items. He returned to the ranch, a drive of fifteen or twenty minutes duration, about noon and, under the supervision of another employee, placed approximately three quarters of the total purchase in plaintiff's mixer. The remainder was put in the deep freeze. To the meat in the mixer was added 100 pounds of well water, 60 pounds of cottage cheese, and about 57 pounds of dry cereal, and the ingredients were mixed for about twenty minutes.

Mrs. Bradow, the employee in charge of the mixing and feeding, testified that she noticed nothing unusual or ab-

normal, either as to appearance or odor, in any of the ingredients. About 12:45 noon when the mixing was completed Mrs. Bradow placed pans filled with the mixture on a cart and started feeding. She finished about 3:30 p. m.

The mink were kept in open pens or cages of wire with wooden houses attached on the sides. Some of the pens contained one mink, some two. Also attached to the side of the pen was a metal feeder plate, L-shaped, about four by six inches in size. In the feeding process a scraper was used to remove any old food on the plate and the scrapings were put in a pail and later buried. When the plate was scraped clean and dry, fresh food was put on. The ordinary feeding was one large spoonful for each male and a half spoonful for each female. August 7th was a Saturday and to relieve the feeding burden on Sunday the older females and the young males were given double portions so that they would not need to be fed on Sunday. When Mrs. Bradow fed the mink on Saturday she observed no symptoms of sickness in the mink. All the mixed food was used up on that day.

Shortly after noon on Sunday Ernest Arndt removed the remainder of the meat from the freezer, mixed it up, and fed it to about 120 mink. On that day, while watering the mink at about 2 p. m., Gerald Arndt noticed a dead kit in one of the pens. Ernest noticed another mink that was paralyzed in the hind quarters.

On Monday morning when Mrs. Bradow went out to the mink pens she noticed a number of the animals sick and paralyzed. The Arndts immediately called a veterinarian, Dr. M. H. Moore, who made a diagnosis of botulinic poisoning and vaccinated the mink. Between August 8th and August 12th, inclusive, 122 of the plaintiff's animals died of this poisoning.

Defendant first contends that the jury's finding, that the food products sold to plaintiff by defendant on August 7,

1954, contained botulinic toxin, is based on speculation and conjecture.

From the testimony of Dr. Moore, who had specialized in bacteriology, it was established that botulinic toxin is a poison generated during the growth of the bacteria Klostridium Botulinum, an organism which is generally prevalent, being soil-borne, but which is not itself poisonous. In order to grow and produce the toxin the following conditions must be present: Temperature between 40 and 95 degrees, absence of air, neutral acid condition of the food, moisture, and essential food elements such as meat or possibly grain; it also needs a large mass of material to work in.

Although in a laboratory a bacteriologist would allow seventy-two hours for the poison to be generated, it is possible for a fatal amount of the toxin to be produced, under the ideal conditions, in a minimum of forty-eight hours. The bacteria will not grow in live tissue nor in freezing temperatures. When conditions are not right for growth it goes into a resistant state, remaining dormant in that state for a long time, and then becomes actively toxic when the right conditions combine.

Dr. Moore further testified that the toxin develops in a small part or pocket in the center of a mass of food material; that if a mass of such food as defendant sold were accumulated in a large pile at warm temperatures and then placed in a freezer, the center of such a mass, which would not be penetrated by the cold for some hours, would be "the ideal place for it to grow in the first place;" that ground food packed into a six to eight-inch-deep can would likewise provide in its interior an ideal situation for such growth, if all the necessary conditions for growth were present. He stated that once the poison has been generated it remains even though subsequently frozen or exposed to air; but boiling

will destroy it. So long as moisture is present, the toxin will remain active for at least thirty days.

It was further established by the doctor's testimony that if botulinic toxin had developed in the interior of a large mass of food, mixing the whole mass would carry the toxin throughout, although it would not necessarily mean that the whole mass would be infected. So far as meat is concerned, Dr. Moore stated it would be unlikely that there would be "too much" toxin present in the carcass itself, but it would be found in tripe that had been contaminated through carelessness.

In the food given to the mink on August 7, 1954, were three ingredients supplied by plaintiff, water, dry cereal, and cottage cheese, and four which had been purchased from the defendant, ground horse meat, tripe, fish, and liver. Dr. Moore testified specifically that botulinic poison, while requiring moisture for its generation, could not be present in water alone, even though water would probably contain the bacteria, since the necessary food elements for the growth would be absent. He also testified that it would not grow in cottage cheese because the acid content is too high. As to the cereal used, the undisputed evidence is that it was a precooked grain cereal in dry, pellet form, packaged in heavy waterproof, sealed paper bags and stored by plaintiff in the feeding house on a rack off the floor. Mrs. Bradow testified that she poured the cereal directly from the bag into the food mixer and that it took quite a while for it to get soaked up by the water. Dr. Moore testified:

"Q. But can you state what the probability of finding botulistic poison in grain would be, as against finding it in a meat ration? A. I think any ration where you have moisture present all the time, that that is certainly a more logical place for it to be. Our grains, if it were loose, in a bin, down where you could more or less pack it and have the moisture, free from air and have the temperature right, you could get

it; but where your cereals are packaged in sacks and piled up, I would say if the sacks were in a dry place then I don't see how you could have botulism in feed, in dry cereal."

In summarizing this portion of the testimony the trial court stated in its opinion:

"From the testimony of the doctor it was apparent that there was eliminated, or at least the jury properly could determine that there was eliminated, the cottage cheese, the cereal, and the water as a source of the poison. This left only the meat products."

It is undisputed that the meat and fish products were called for by plaintiff at about 11 a. m. on August 7th and were fed to the mink by 3:30 that afternoon, an interval of four and one-half hours. Considering the testimony that botulinic toxin will not be generated in fatal amounts in less than forty-eight hours even under ideal conditions for its development, it is obvious it could not have developed in these products between the time of sale and the time of their use. The evidence also is that the poison could not develop while it remained uneaten on the food plates in the pens, even for a period of twenty-four hours. Dr. Moore stated that the amounts fed would not have provided a mass large enough for the toxin to develop and the necessary condition of lack of air would not exist in the pens.

The mink died of botulinic poisoning; the diagnosis was positive and undisputed. Dr. Moore testified that such poisoning results only from food the animals have eaten and the toxin cannot develop in the food after it is eaten; after being consumed by the mink, symptoms of the poisoning would appear in the animal at any time between twenty-four hours to four or five days. Although plaintiff had suffered no death in its herd during the previous three weeks, Arndt found one dead animal on the 8th, about twenty-four hours after the Saturday feeding; 29 died on August 9th, 50 on

August 10th, 36 on August 11th, and six on August 12th, all within the one to five-day interval after the August 7th feeding. It was Dr. Moore's opinion that:

"I don't think the feeding Sunday had anything to do with it. It had to be the Saturday's feed, they didn't find any line, there were dying animals and dead animals in the doubles as well as in the singles, and some of the doubles that were fed on Sunday, it did not make any difference; one group was fed twice and others only once, it did not follow a line like that.

"Mr. Curran: So that it was probably the Saturday feeding, in your opinion? *A*. I think so."

Defendant bases its argument that the jury finding was speculative on *Walraven v. Sprague, Warner & Co.* (1940), 235 Wis. 259, 267, 292 N. W. 883, where it was alleged that one of the plaintiffs became ill as the result of eating a salad containing, among other things, poisonous crab meat and tuna fish sold by defendant. This court held that although the evidence was sufficient to show that the illness was probably caused by some poisonous substance in the salad, there was insufficient evidence of contamination of defendant's products to support a jury finding to that effect. While there was expert opinion in that case eliminating the ingredients of the salad other than the crab meat and tuna fish, the court stated that such opinion was based upon "but a series of conclusions, each of which is in turn deduced from but other conclusions of plaintiffs' expert witness" rather than facts and circumstances established by direct evidence; and the court held that the ultimate conclusion of the witness could not therefore be of sufficient probative value to sustain a verdict based thereon. Here the record is not only replete with facts from which the jury could draw its own conclusions, but Dr. Moore's conclusions were based on undisputed facts.

With respect to the veterinarian's opinion that it was the August 7th feeding which caused the sickness in the mink,

defendant points out that he also stated it was possible that food eaten prior to that date was the cause. He stated it was "possible but not likely" and explained his answer thus:

"Those of the worst I am sure where symptoms are most severe in botulin poisoning, we have deaths within approximately twenty-four hours from the time the toxin is ingested, if it is ingested four or five days before that we would have deaths in some mink ·on that ranch before that time.

"*Q.* I don't see how you can say that and still be consistent with your opinion that symptoms may appear four–five days after the food is taken. Will you explain that? *A.* Doesn't it stand to reason if you feed poison to anything in your whole group some are going to get sick immediately—well, within reason—and others will go a longer time, all depending on their resistance and the amount of toxin they took on. In this case the animals that did not eat as much; the safest animal out there would be the animal off his feed that he would not eat it.

"*Q.* Of course, you have no knowledge of the feeding habits of these particular mink, do you? *A.* No.

"*Q.* And you had no knowledge when you got to the ranch on August 9th whether they had been fed the day before or two days before? *A.* That doesn't make any difference, I went on the basis of symptoms."

This was testimony based on facts within his expert knowledge, consistent with his other testimony on the subject and consistent with the facts testified to by others with respect to how and when the symptoms appeared. It was credible and the jury was entitled to believe it. Since, as the trial court stated, the jury could properly determine from all the evidence that the cottage cheese, the cereal, and the water were eliminated as a source of the poison, it required no speculation on the part of the jury to find that it was the defendant's products which contained the poison.

Defendant next contends it was error to hold it violated sec. 94.72 (14) (b), Stats., where there was no showing that the food sold by it was mixed with an injurious sub-

stance that was not an element in the natural production of the food. It is argued the evidence shows that botulinic toxin develops without any mixing or adulteration on the part of anyone. It is, however, not a natural part of the food itself. The bacteria is an organism foreign to the food and so is the toxin which it produces when it grows. To use an illustration given in plaintiff's brief—as foods that contain an injurious substance which is an element in the natural growth of the food one could cite the caffeine in coffee, the opium in white poppy seeds, or the tobacco tar in tobacco. Botulinic toxin cannot be placed in that category; it is an injurious substance produced by something entirely foreign to the food, and its presence in food constitutes an adulteration. When the food so adulterated is sold, the statute is violated. As this court held in *McAleavy v. Lowe* (1951), 259 Wis. 463, 474, 49 N. W. (2d) 487:

". . . the wrongful act which is prohibited by the statute is the sale, or offering for sale, of the adulterated feed, and not the act of mixing or adulterating the feed with the injurious substance."

Defendant argues, in effect, that in *Cohan v. Associated Fur Farms* (1952), 261 Wis. 584, 53 N. W. (2d) 788, we took a different view. That case decided matters of pleading. In the language quoted therefrom by defendant, this court merely held that in order to state a cause of action under sec. 94.72 (14) (b), Stats., the language of the statute must be used. In so holding, the opinion quoted the words "mixed or adulterated" from the statute and stated that the complaint must so allege if the remedy of the statute is sought. Nothing in that opinion can be regarded as modifying the interpretation placed upon the statute in the *McAleavy Case*.

Lastly, it is contended that the jury based its award of damages on speculation.

Ernest Arndt estimated that 75 per cent of the 122 mink lost represented breeding stock and 25 per cent pelting stock.

At the values he placed on such animals, he estimated the loss on the 122 mink at $6,539.50, from which he deducted $366 as the cost of feeding 122 mink between August and November (pelting time), or a net loss of $6,173.50. Pelting stock was valued at less than breeding stock. Defendant contends the error in Arndt's computation is shown by the fact that in the fall of 1954 he actually kept only 56 per cent of his mink for breeders and pelted 44 per cent, and applying this formula to the 122 mink lost would result in damages lower than the amount found by the jury. It is entirely conceivable, however, that the reduction of plaintiff's herd by botulism affected the Arndts' plans as to the number of mink to be kept and sold that fall, particularly since all the mink lost were young. No testimony was elicited from them on this or any other circumstances which may have had a bearing on the subject. It is obvious that the jury, assessing the damages at $6,100, based its award on the 75–25 per cent estimate of Ernest Arndt. While it could have used the 56–44 per cent formula, it was not required to do so, since there is nothing in the record to show that those percentages would have been used by the plaintiff if the loss had not occurred.

*By the Court.*—Judgment affirmed.