TRI CITY FUR FOODS, INC., Appellant, v. AMMERMAN and another, Copartners, d/b/a CHASETOWN MINK RANCH, Respondents.

*April 6—May 5, 1959.*

150

For the appellant there were briefs by *Brazeau & Brazeau* of Wisconsin Rapids, and *Johns, Roraff, Pappas & Flaherty* of La Crosse, and oral argument by *Robert D. Johns.*

For the respondents there was a brief by *Wayne B. Schlintz* of Viroqua, and *Donovan, Gleiss, Goodman, Breitenfield & Gleiss* of Sparta, and oral argument by *Mr. L. J. Goodman* and *Mr. Schlintz.*

BROWN, J. Tri City first submits that the jury finding on question 1 is not supported by the evidence.

"It is the well-recognized rule that when a jury's findings are attacked, particularly when they have had the trial court's approval, our inquiry is limited to the issue whether there is any credible evidence that, under any reasonable view, supports such findings. With the rule in mind we consider that it is necessary to recite only the testimony which supports the jury's findings. Some of it is in dispute, but as to the disputed testimony we must recognize that it was for the jury to determine where the truth lies. . . .

"The jury is not restricted to a consideration of the facts proved even though they be undisputed. They may give

effect to such inferences as reasonably may be drawn from them. [Case cited.]" *Olson v. Milwaukee Automobile Ins. Co.* (1954), 266 Wis. 106, 109, 111, 62 N. W. (2d) 549, 63 N. W. (2d) 740.

Ammerman bought a large quantity of Tri City frozen horse meat in late December, 1956, and began to feed it to his mink on March 3, 1957. He also fed his animals pork livers and a beef by-product called "North Star." Both of these foods were obtained from sources other than Tri City. The female mink gave birth to their offspring in about the month of May and were weaned about June 5th, at which time the young mink began to eat the food supplied by Tri City and by the other dealers referred to. The mink commenced to die about July 7th, and a high rate of mortality continued until August 23d. Ammerman consulted Tri City and also consulted a veterinarian who conducted post-mortems and who also sent the food to a laboratory for testing. The veterinarian suspected that at least portions of the diet were contaminated and this caused the trouble, and he advised eliminating successive items of diet until the trouble-causing items were identified. At first Ammerman ceased feeding the pork livers but there was no change in the death rate and after several days the pork-liver diet was restored and North Star was stopped. There was still no change and North Star was resumed, and on August 1, 1957, Tri City horse meat was stopped. The deaths continued until August 23d, with no resumption of horse meat, but on August 23d the deaths ceased. The sick mink displayed symptoms during their illnesses of tarry droppings. After August, 1957, the death rate dropped down to normal although Ammerman continued feeding the pork liver and North Star products but did not resume Tri City food after August 1st. Ammerman testified that there had been no change in his method of preparing the food or in his feeding practices, that he did not change the

utensils used in feeding, and made no change in the water given the mink.

It is unnecessary to repeat the detailed evidence of seven separate mink raisers who testified for Ammerman. In brief, the Tri City horse meat was bought by these witnesses at about the same time that Ammerman bought his. Their various stocks of mink reacted as Ammerman's did in similar manner and in approximately the same periods of time after they had started eating the Tri City meat. These witnesses also said that their mink ceased dying after being deprived of Tri City meat in a short time. These mink, raised on a variety of farms with a variety of feeding methods respecting sanitation and with various articles of diet supplementing the Tri City food, reacted the same way. The common factor appears to be the feeding of the Tri City meat. The disease followed quickly after the mink had used it steadily in their diets and the cure followed not long after the Tri City diet was eliminated.

The Tri City counsel suggests that there was a mink epidemic which spread from one ranch to another from unidentified causes. This would be more persuasive if there was evidence that mink were also dying in this manner which in this period were never fed on the Tri City product. There is no such evidence.

We think the experience of Ammerman and his fellow mink ranchers warrants an inference that the Tri City meat, being the common factor, was contaminated and the deaths were caused thereby. In addition Ammerman had a number of expert witnesses, a veterinary, bacteriologists, and biologists, who to us laymen appear to have imposing credentials. Dr. James testified that he took samples of Tri City frozen meat from Ammerman's stock and identified its contamination by Klebsiella, Shigella, and Salmonella. These he said are enteric poisons and, given sufficient doses and over sufficient time, will produce mink deaths.

The onset varies according to the concentration of poison and the animal's power of resistance. Recovery will vary also at different rates when the poison is removed. Small samples which Dr. James tested showed a heavy concentration of poison indicating large doses in the feeding portion. Dr. James took samples of Tri City food from the other ranches which were having similar troubles and which samples he found contained Klebsiella bacteria. Some samples which he took from blocks of the frozen food were negative but he found no blocks which were negative. His samples for analysis were procured from the inside of blocks of frozen meat, extracting the samples with sterile instruments. He testified:

"There is no question in my mind but what the bacteria we found in the meat were in there at the time the meat was processed."

Expert witness Hartsough, a veterinarian, whom Ammerman called in when he was disturbed about his mink diseases, testified that he made four autopsies and found Klebsiella infection in each carcass. He testified that all of the mink he saw he diagnosed as dying of that disease,— Klebsiella. An Ammerman expert testified also that the Klebsiella present at the time the horse meat was processed and frozen by Tri City would remain alive or active although frozen for periods such as this freezing endured and would produce disease when thawed out and fed to the mink. He testified that sanitation might be helpful in keeping out contamination acquired at the ranch but if the food was contaminated before Ammerman got it the sanitary measures would be of little help.

It is true that Tri City had its own expert biologists whose qualifications to us look just as impressive as Ammerman's and these experts disparaged the tests conducted by the Ammerman scientists. Tri City experts did

not find that the suspected Ammerman meat was contaminated with disease-producing Klebsiella and therefore concluded that it was not present. Tri City also had mink ranchers to testify that they fed Tri City meats to their stock without bad results. These appear to us to be strictly jury questions. We are unable to say that the verdict in the answers to questions 1 and 2 is unsupported by the evidence and therefore we must sustain these jury findings.

Question 3 concerns the deaths of two Pearl male mink breeders. Tri City submits quite truly that there are no details in evidence concerning the illnesses or deaths of these animals and therefore the causes of death are merely speculative. But it appears to us that the sick and deceased animals are,—all of them,—mink. There is no difference in evidence regarding their feeding, care, or other living conditions. They died in the same period that Ammerman's other mink died. Without any evidence to support a contrary conclusion, we think that a reasonable inference may be drawn by the jury that these mink died from the causes found to have killed their companions. We hold this to be a permissible inference, not just a speculation under these circumstances, concerning the cause of these deaths.

The owner of the mink testified that the Pearl pair were of a fair market value of $750 each. The jury valued them at $1,200 for the pair. In our view the answers of the special verdict dealing with the two mink and their value have credible, competent evidence in their support and we must sustain them.

Tri City contends that there is insufficient proof of value of the mink which died, or the surviving mink which were impaired for breeding or pelting. It is unnecessary to review the evidence and we only say that the proof seems to us sufficient to sustain the jury in determining amount of loss.

Tri City attacks the findings of the special verdict dealing with damage to Marshall, questions 5 and 6.

Ammerman resold and delivered some of the Tri City meat to a rancher named Marshall. Marshall's mink died in the same manner and in about the same time after starting to feed this meat to his stock, just as was Ammerman's experience. The same evidence supports the cause of Marshall's loss as of Ammerman's. In his claim for damages in this action against Tri City, Ammerman includes the potential claim which Marshall may make against him. Tri City contends that it is error to allow this element of damages.

Tri City submits that Ammerman's action is one which he brings against Tri City for breach of warranty. The complaint bears this out. Then Tri City relies upon *Cohan v. Associated Fur Farms* (1952), 261 Wis. 584, 53 N. W. (2d) 788, which holds that action for breach of warranty does not carry from an ultimate buyer across an intermediate seller against the original seller. This is true because between the first seller and the last of a series of purchasers there is no privity of contract. In that case plaintiff Cohan bought contaminated food from Associated Fur Farms which Associated had bought from Armour. The decision deals mainly with the pleadings. Cohan sued both Associated Fur Farms and Armour. We held that Cohan's action did not lie against Armour for breach of warranty for the reasons above stated. Also, we held that Associated Fur Farms, in its action against Armour, could not charge against Armour the prospective liability of Associated to Cohan. But this was because Associated had already sued in another court and recovered damages from Armour, in which suit Associated omitted to include its prospective claim against Associated by Cohan. He was required to do so at that time and could not do so thereafter. We did not hold or imply that Associated would not have been able to include in its first suit against Armour the prospective consequential damages for which Associated might be liable to Cohan. Quite the contrary.

In the case at bar, Marshall is not bringing any suit against Tri City, either for breach of warranty, negligence, or anything else. If Marshall can prove his facts, Ammerman will be liable to him upon sec. 94.72 (14) (b), Stats., which prohibits under penalty any person who shall sell any feeds, mixed or adulterated, with any substance injurious to the health of the livestock. Violation of the statute is negligence *per se*. *Metz v. Medford Fur Foods* (1958), 4 Wis. (2d) 96, 90 N. W. (2d) 106. In *Arndt Brothers Minkery v. Medford Fur Foods* (1957), 274 Wis. 627, 80 N. W. (2d) 776, we held that it is adulteration to have the mink food contaminated by botulinic poisoning. In that case the bacteria developed with resulting botulism and this seems to us to be on all fours with the Klebsiella poisoning in the present case. In *Arndt Brothers Minkery v. Medford Fur Foods, supra,* page 636, we said:

"It is, however, not a natural part of the food itself. The bacteria is an organism foreign to the food and so is the toxin which it produces when it grows. To use an illustration given in plaintiff's brief—as foods that contain an injurious substance which is an element in the natural growth of the food one could cite the caffeine in coffee, the opium in white poppy seeds, or the tobacco tar in tobacco. Botulinic toxin cannot be placed in that category; it is an injurious substance produced by something entirely foreign to the food, and its presence in food constitutes an adulteration. When the food so adulterated is sold, the statute is violated."

The adulteration of Tri City meat is governed by the two *Medford Fur Foods Cases, supra,* and the facts of the adulteration being proved, the sale of the Tri City product, whether by Tri City or Ammerman, violates the statute. If damage to Marshall resulted, causal negligence could be found by such sale and an action would lie by Marshall against Ammerman. This consequential potential damage is one which Ammerman might collect for against Tri City

if his proof permits. It is clear that Marshall's recovery is not dependent against Ammerman on breach of warranty by Tri City or that it is affected by a lack of privity between Marshall and Tri City.

Upon motions after verdict the trial court deemed the prospective damages from Ammerman to Marshall were excessive. In an opinion the trial court stated that the lowest value of mink lost by Marshall which could be sustained by evidence was $2,247.60. The jury had allowed $4,500. Then the court said that loss due to depreciation of Marshall's herd of mink should not exceed $500. That means $500 is the highest value sustainable by the evidence. The jury had given $1,000. The trial court gave an option to Ammerman to accept $2,247.60 for loss of mink. Such an option given to Ammerman, the lowest sustainable figure, is correct. But the trial court then gave Ammerman an option to accept $500 for depreciation on Marshall's stock. Ammerman exercised these options. The court had just decided that the verdict for this loss could not *exceed* $500. Therefore this is the highest figure sustainable and Ammerman should have been given the option to take the lowest, not the highest, such amount. This was error and would invalidate the option given to Ammerman and would require a new trial, at least to that extent, except that Ammerman in his brief consents:

"If, however, this court should conclude that the trial court did mean, in reference to the loss sustained by Loren Marshall due to depreciation of the value of the fur, that the sum of $500 was the highest sum that a jury could properly assess for that portion of the loss, then we are willing to forego further demand for that portion of the damages to avoid the costs and expense of another trial for the purpose of determining the actual amount of loss sustained by Loren Marshall because of depreciation of the value of the fur."

We consider this concession cures the error and no prejudice because of the erroneous option can result to Tri City, as so corrected.

The conclusion is that our decision should affirm the judgment except by the $500 elimination of any damages for depreciation of Marshall's stock. As so modified, the judgment should be affirmed.

*By the Court.*—Judgment reduced by $500 and, as so modified, judgment is affirmed.

FAIRCHILD, J. (*concurring*). In *Gennrich v. Schrank* (1959), 6 Wis. (2d) 87, 93, 93 N. W. (2d) 876, I suggested a change in the rule as to options where damages are deemed excessive. While that was a personal-injury case, some of the reasons given for not requiring the judge to fix the least amount would also apply in a case involving damage to property. I concur in the modification of the judgment in this case, however, because of the concession of counsel.