McALEAVY, Respondent, vs. LOWE and another, Appellants.

*September 12—October 9, 1951.*

464

468

470

For the appellant John T. Lowe there was a brief by *Doar & Knowles* of New Richmond, and oral argument by *W. T. Doar* and *John Doar.*

For the appellant Cargill, Inc., there was a brief by *Wilcox & Sullivan* of Eau Claire, and oral argument by *Francis J. Wilcox.*

For the respondent there was a brief by *Maloney & Wheeler* of Madison, and oral argument by *Norris E. Maloney* and *Floyd E. Wheeler.*

CURRIE, J. The appellants on their appeal raise the following issues:

(1) Sec. 94.72 (14) (b), Stats., does not apply to the sale of screenings by Cargill to Lowe because such sale was completed outside the jurisdiction of Wisconsin law, to wit, in the state of Minnesota.

(2) The statute does not apply because screenings are not "a feed."

(3) The statute does not apply because there was no evidence of any mixture or adulteration of an injurious substance with the screenings.

(4) That it was error to hold that the violation of the statute constituted negligence *per se* on the part of the two defendants, because the defendants were "without fault."

(5) That there was no privity of contract between Cargill and the plaintiff and therefore Cargill could not be held liable to the plaintiff at common law.

(6) That there was an absence of causal relationship between the alleged harmful substance and the plaintiff's damage, and therefore insufficient evidence to substantiate the jury's answer to question No. 8 of the verdict.

(7) That an erroneous measure of damages was applied.

(8) That the trial court committed error in the charge to the jury.

(9) That the trial court made evidentiary rulings prejudicial to the defendants.

1. This action is predicated upon a violation by the defendants of sec. 94.72 (14) (b), Stats., which reads as follows:

"Any manufacturer, importer, jobber, firm, association, corporation, or person who shall sell, offer, or expose for sale or distribute any feeds mixed or adulterated with any substance or substances injurious to the health of livestock or poultry shall be deemed guilty of a misdemeanor and in addition to the penalty provided in this section, the lot of feeds shall be subject to seizure by judicial court action, condemnation, and disposition as the court may direct, . . ."

The defendant Cargill contends that in order for Cargill to be found guilty of violating this statute, it would be necessary to find that a sale, as such term is defined in ch. 121, Stats., must have been made within the territorial limits of Wisconsin. It contends that the sale was actually made in Minnesota, and that title was transferred in Minnesota subject only to the retention of a lien for the security of payment, and that the transaction was a Minnesota transaction in its entirety. The trial court, on the other hand, was of the opinion that the act of sale was not completed until the order bill of lading was delivered over by the bank as Cargill's agent at Ellsworth, and that up to that time Cargill would have been in a position to retain the sight draft and bill of lading if it saw fit. We believe the trial court was correct in so holding.

2. Defendants contend that sec. 94.72 (14) (b), Stats., has no application to mixed bulk screenings because screen-

ings are not "a feed," claiming that screenings are but an ingredient, which, after processing, can be used to mix with other materials to produce a feed. The employee of Cargill who handled the sale of the screenings to Lowe testified that dealers ordinarily bought the screenings for the purpose of selling the same to farmers for the purpose of feed for animals. The testimony shows that the plaintiff and several other farmers purchased screenings, and fed the pigs the screenings without mixing the same with other ingredients, while other farmers did mix the screenings with grain or other feed. We hold that bulk mixed screenings are embraced in the word "feeds," as used in the statute, and it made no difference whether the same were usually mixed with other feed before feeding to livestock, or not.

3. Defendants contend that in order to find a violation of sec. 94.72 (14) (b), Stats., there must be some proof that someone mixed or adulterated the injurious substance complained of (in this case mercury) with the screenings, and it is insufficient to merely find the presence of mercury in the screenings. They point out that mercury, while not found in the natural growth of grains, is an element commonly used in the treatment of said grains, and, if already present in the grains which were brought to the Northwood elevator for screening, then there could have been no mixture or adulteration of the screenings. It would seem to be a sufficient answer to this argument to point out that the wrongful act which is prohibited by the statute is the sale, or offering for sale, of the adulterated feed, and not the act of mixing or adulterating the feed with the injurious substance. It is sufficient to prove that the feed in question contained an injurious substance that was not an element in the natural growth or production of the feed.

4. It is apparent that the trial court framed the special verdict and instructed the jury on the theory that a violation

by the defendants of sec. 94.72 (14) (b), Stats., constituted negligence *per se* in the present civil action for damages. Counsel for the defendant Lowe advance a very persuasive argument in their brief, and presented it with great force in the oral argument, that the doctrine, that the violation of a criminal statute is negligence *per se* in a civil action for damages based upon an act done in violation of a statute, should not be applied to the present fact situation, because to do so would "impose liability without fault." They urge that the authorities recognize an exception in the application of this negligence *per se* doctrine in those cases where there is a technical violation of a criminal statute without fault.

This court has long been committed to the principle that one who violates a criminal statute must be held negligent *per se* in a civil action for damages based on such violation. A typical illustration of the application thereof is afforded by the case of *Mossrud v. Lee,* 163 Wis. 229, 232, 157 N. W. 758. In that case plaintiff purchased from defendant jugs of a liquid called "Quack Grass Destroyer" without any label being affixed bearing the word "Poison" and without making the purchaser aware of the dangerous character of the substance, and in so doing the seller violated sub. 5 (a), sec. 1419, Stats. 1913. The substance was applied by the purchaser to a small piece of quack grass in an oat field into which livestock was pastured. The plaintiff's cattle ate some of the quack grass and eight cows died as the result, and plaintiff brought an action for damages to recover the value of the eight cows from the defendant. Mr. Justice MARSHALL, in the opinion of the court, said in reference to the violation by the defendant of such statute: "Such statute having been enacted for the protection of life and property, a violation of it, under a very familiar rule, is negligence *per se*;" and the judgment below in behalf of the plaintiff was affirmed.

In adopting and following the principle that violation of a criminal statute is negligence *per se,* Wisconsin is in accord with the rule followed by a majority of the courts of other states: 38 Am. Jur., Negligence, p. 827, sec. 158; 65 C. J. S., Negligence, p. 417, sec. 19c; and Anno. 132 A. L. R. 863. Restatement, 2 Torts, p. 752, sec. 286, also states the doctrine of negligence *per se* as being the law.

However, even our court has recognized that cases may arise when the rule will not be applied. In *Johnson v. Prideaux,* 176 Wis. 375, 187 N. W. 207, the defendant in driving his automobile on a dusty road became enveloped in a cloud of dust caused by a passing car, and threw off his power, applied his brakes, and brought his car to a stop in thirty-six feet. In so doing he unconsciously permitted his car to swerve to the left side of the road where it was struck by plaintiff's automobile. The trial court found the defendant guilty of negligence because he had violated the statute requiring him to keep to the right side of the center of the highway upon meeting another vehicle. This court reversed the judgment rendered below in behalf of the plaintiff and said (p. 378):

"While the law requires the driver of an automobile to keep to the right when meeting another vehicle, *one cannot be held guilty of negligence in unconsciously failing to do so where that is impossible by reason of circumstances over which he has no control and for which he is in no sense responsible.* The defendant was confronted by an emergency which was not created by his own negligence, and in that emergency it would seem that he did the most prudent thing possible in bringing his car to an immediate stop. We apprehend that no more prudent action under the circumstances could be suggested, and it would be an anomaly to hold one guilty of negligence who acts with the care and prudence exercised by the defendant under the circumstances then confronting him." (Emphasis supplied.)

Other illustrations of instances in which courts have recognized exceptions to the rule that violation of a criminal

statute is negligence *per se* are cited in articles appearing in 46 Harvard Law Review, 453, and 37 Michigan Law Review, 811. The principles governing these exceptions are stated in 65 C. J. S., Negligence, p. 426, sec. 19h, as follows:

"Prudence may sometimes require the doing of an act which would otherwise be in violation of law, and, even though an act or omission involves a violation of a statute or ordinance, liability may, in some cases, be avoided by showing that under the circumstances of the particular case the violation was justifiable or excusable; but the fact which will excuse a technical violation must result from causes or things beyond the control of the person charged with the violation."

We do not believe that the facts in the present case are such as to fall within one of the recognized exceptions to the general rule. While it is true that the record is completely silent as to any act of the defendants being in any way responsible for the presence of the mercury in the screenings, and it is admitted that neither defendant had any knowledge of its presence, nevertheless both defendants did sell screenings containing mercury, a substance injurious to livestock, in violation of sec. 94.72 (14) (b), Stats. The presence of such mercury could have been detected by chemical analysis. It may seem extremely harsh to impose such a responsibility upon a small country feed dealer such as Lowe. However, the legislature must be deemed to have known at the time of enactment of this statute that it was the well-established law of this state that anyone who violated such a statute would be held guilty of negligence *per se* in a civil action for damages. The harsh result of the present case could have been avoided if the legislature had inserted the word *"knowingly"* in the statute at time of enactment, but this the legislature did not see fit to do.

5. Defendant Cargill contends that because there was no privity of contract between it and the plaintiff, Cargill could not be held liable to the plaintiff by common law, and cites

*Hasbrouck v. Armour & Co.* 139 Wis. 357, 121 N. W. 157; *Miller v. Mead-Morrison Co.* 166 Wis. 536, 166 N. W. 315; *Prinsen v. Russos,* 194 Wis. 142, 215 N. W. 905; and *Walraven v. Sprague, Warner & Co.* 235 Wis. 259, 292 N. W. 883, as authorities sustaining such contention. It would be purely academic, and unnecessary to the determination of the issues of this case, for us to determine the liability of Cargill to plaintiff at common law because of our holding that Cargill was liable to plaintiff as a result of its violation of sec. 94.72 (14) (b), Stats.

6. Question No. 8 of the special verdict read: "Was the said substance or substances so mixed or adulterated with the said screenings, the proximate cause of the illness and death of plaintiff's hogs?" which the jury answered, "Yes." The defendants contend that the trial court should have changed the answer to this question on motions after verdict on the ground that no causal relationship was established between the alleged harmful substance (mercury) and plaintiff's damage. The facts in this case, as supported by credible evidence in the record, have been set forth at length preceding this opinion. The fact that the pigs of other farmers which were fed the screenings reacted in the same way as did plaintiff's pigs, the results of the feeding experiment conducted on a scientific basis at the College of Agriculture of the University of Wisconsin, and the results of the post-mortem examinations, amply support the jury's answer to the causation question.

7. Defendants contend that an erroneous measure of damages was applied by the trial court.

The plaintiff's original theory of the measure of damages was the value of the thirty-four pigs at six months of age (the time at which plaintiff originally intended to market them), less the cost of labor and feed in caring for them until that time, and cited the case of *Schrank v. Philibeck,* 251 Wis. 546, 30 N. W. (2d) 233. The trial court was of the

opinion that the measure of damages contended for by plaintiff was too speculative, but in view of the fact that the veterinarian called in by the plaintiff had recommended that the plaintiff should retain the pigs in an attempt to adopt measures to restore them to health, the plaintiff would be justified in retaining the pigs a reasonable length of time before disposing of them. The trial court held, as a matter of law, that until September 5, 1947 (September 7, 1947, in the charge to the jury), was a reasonable time for the plaintiff to have so retained the pigs in an attempt to save them, which was roughly thirty days after plaintiff had first discovered their illness. As of September 5th plaintiff's pigs would have been approximately four to four and one-half months old. The trial court permitted testimony to be received as to what the market value of normal feeder pigs of that age would have been and also admitted evidence as to the cost of special feed fed by the plaintiff after the pigs became sick up until September 5th, and the value of plaintiff's extra labor in caring for the sick pigs during such period. The trial court, in its instructions to the jury, stated that it was the plaintiff's duty to minimize his damage by endeavoring to restore his hogs to a healthy condition, and that if he found that within a reasonable time that they were not responding to treatment and were apparently getting worse, then it became his duty to dispose of his pigs in the best manner available, so as to reduce his loss as much as possible. The court further stated in its charge:

"It seems to the court that thirty days after discovering that they were ill would be a reasonable time within which to attempt to restore them to health and to bring them back to a healthy condition. This would be about the 7th of September. At that time, if all his efforts to restore them to health were unsuccessful, it was his duty to sell the hogs for the best price obtainable in the market for any purpose. The plaintiff's measure of damages for his loss is the difference between what he could have obtained for his hogs on or

about the first week in September, 1947, in the condition they were then in and what they would have brought if they had developed normally from the time that they first took sick."

In addition, the trial court pointed out that additional elements of damage would be the unused screenings, money spent for veterinary fees, reasonable services in attempting to restore the herd to a healthy condition, less the cost of any feed that the pigs would have eaten if they had been fed normally up until the first week of September, 1947. If the rule of damages adopted by the trial court is correct, there is sufficient evidence to substantiate a verdict of $1,800.

Dr. Knorth, the veterinarian called in by the plaintiff, had advised Mr. McAleavy to change the diet, and the plaintiff, in retaining his pigs and attempting to nurse them back to health, was but following the veterinarian's advice. After the inception of their illness the pigs were unsalable for human consumption, and had no value at all because the rendering plants would pay nothing for pigs of that size. Only four of plaintiff's pigs had died up to August 31st, including the two which were posted.

The question of what was a reasonable time for the plaintiff to retain the pigs in an attempt to restore them to health before disposing of them in order to minimize his damages ordinarily is a question for the jury, and not the court. However, any finding by the jury that such reasonable period was one substantially less than thirty days would have been without support in the evidence. If error were committed by the trial court in taking this issue away from the jury, the plaintiff, and not the defendants, was the only party prejudiced thereby.

The defendants further urged that it was error for the trial court to have admitted testimony as to the market value of normal feeder pigs of the same age as plaintiff's pigs were after retaining them into the first week of September. They contend the question should have ascertained as to what the

market value of pigs of such age would have been if they had been fed screenings exclusively for sixty days. The reason for urging this is that the testimony showed that feeding pigs exclusively on screenings for sixty days would have caused serious injury to them because of the deficiency of nutrients in the screenings. Whatever may have been the plaintiff's original intention as to the length of time he planned to feed the screenings exclusively to his pigs, the actual fact is that he fed screenings exclusively for only approximately twenty-four days. One expert witness testified without dispute that feeding screenings exclusively for a period of thirty days would result in the pigs weighing less than if fed a well-balanced ration all the time. However, there was undisputed testimony that the market price which would be paid for pigs four and one-half months old the first week in September, 1947, to be used as feeder pigs, did not vary with the weight of the pig and that some variance in weight would have had little effect on their market value for such purpose.

After careful consideration of the questions raised by the defendants as to damages, it is our conclusion that there was no prejudicial error committed requiring a new trial.

8. The defendants contend that the trial court committed error in the charge to the jury.

The court instructed the jury that "an injurious substance is any material which, when eaten by livestock in sufficient quantity, will do damage to the health of livestock." Defendants argued that under such a definition even the most wholesome substances would be injurious because of the possibility of livestock overeating. However, there was no claim made at the trial that plaintiff's pigs had overeaten a wholesome substance, but the defendants' contention was that the screenings were deficient in nutrient value and therefore the damage to plaintiff's pigs was caused by feeding screenings exclusively. This particular instruction related to question No. 2 of the special verdict reading as follows:

"Were the screenings sold to the plaintiff, John McAleavy on or about July 7, 1947, by the defendant John T. Lowe mixed or adulterated with any substance or substances injurious to the health of hogs?"

The extract from the charge objected to by the defendants was preceded by the following statement:

"You will notice that by this section the sale of any feed mixed or adulterated with any substance or substances injurious to the health of animals or livestock is absolutely prohibited."

and was followed shortly thereafter by this statement:

"A feed which is merely deficient in some essential or nonessential food values cannot be said to contain an injurious substance."

Therefore, considered in its context we do not consider the quoted portion of the charge criticized by the defendants to have been prejudicial or open to the strained interpretation placed upon the same by them.

Question No. 8 of the special verdict read:

"Was the said substance or substances so mixed or adulterated with the said screenings the proximate cause of the illness and death of plaintiff's hogs?"

In charging the jury as to this question, the trial court stated:

"If you determine that the primary cause of the illness and death of plaintiff's pigs was his failure during the approximate one month in which he fed screenings to supplement the screenings with other nutritious feeds, then you should answer question No. 8 'No.' If, on the other hand, you determine that the dietary insufficiency of the screenings which were fed for a period of one month would not have by itself caused the illness and eventual death of plaintiff's pigs, but rather merely have weakened the pigs, and you further determine to a reasonable certainty by a preponderance of the evidence that the injurious substance or substances

was the material and dominant cause of the illness and death of the pigs, you should answer this question 'Yes.' If you are not so convinced you should answer it 'No.' "

Defendants contend that separate questions as to the contributory negligence of the plaintiff should have been submitted to ascertain whether plaintiff was negligent in the use of the screenings and whether such negligence was a cause of the illness of the pigs, and that the attempt to handle this question solely by the foregoing instruction was error. We hold that the instruction was proper and that no question of contributory negligence of the plaintiff and its causal effect should have been submitted in the special verdict. Even if it were negligence for the plaintiff to have fed his pigs screenings exclusively for twenty-four days, the following principle stated in 38 Am. Jur., Negligence, p. 702, sec. 54, would be applicable:

"Negligence which merely furnishes the condition or occasion upon which injuries are received but does not put in motion the agency by which the injuries are inflicted is not the proximate cause thereof."

9. Defendants complain of certain rulings on evidence made by the trial court.

Dr. Kozelka, a toxicologist of the University of Wisconsin Medical School, was permitted over objection to testify as to what he found as a result of performing an autopsy on certain rats upon which feeding experiments had been made; as to whether pigs evidencing certain symptoms, and having an entire absence of other symptoms, were suffering from volatile mustard-oil poisoning; as to what are the symptoms of volatile mustard-oil poisoning; the quantity of mercury a pig would have ingested in a thirty-day period from a certain specified quantity of feed containing a certain specified amount of mercury; and as to whether the feeding of certain materials in addition to the screenings would have any influence on the effect of mercury upon the pigs. The defendants

contend that only a veterinarian was qualified to give such testimony. We perceive no error in the trial court's rulings in this respect.

The defendants also contend that there was not sufficient similarity between the conditions under which the pig-feeding experiment was conducted at the University College of Agriculture with those prevailing in the pig pasture on plaintiff's farm to warrant the introduction of testimony as to such experiment. The defendants point out that the pigs were of different breed, and that in one case the pigs were confined to a small inclosure on a concrete floor, while in the other they were in a seeded pasture of some size. It is inconceivable that such dissimilarities would have any material effect. The plaintiff established similarity of the essential factors sufficient to admit the testimony, and the defendants offered no testimony that any of the above-mentioned dissimilarities could have affected the result.

Lastly, the defendants urged that the trial court should not have admitted the testimony of the experiences of the other farmers who fed the screenings to their pigs on the ground that the plaintiff failed to show sufficient similarity between the conditions of the pigs of plaintiff and those of the other farmers. We have carefully considered this point and conclude that the admission of this testimony was proper.

*By the Court.*—Judgment affirmed.