BLANCHARD, J.
*246 ¶ 1 This is a tort action arising from a mass casualty shooting at a salon in Brookfield, Wisconsin. It is alleged that the shooter, Radcliffe Haughton, bought the firearm and ammunition he used in the shooting after responding to a "for sale" post that appeared on a website, Armslist.com. Yasmeen Daniel, the daughter of shooting victim Zina Daniel Haughton and the administrator of her mother's estate, has filed multiple tort claims against Armslist, LLC, which created and operated *214 Armslist.com.[1] Significant to Daniel's claims, when Radcliffe purchased the firearm and ammunition, he was prohibited by a state court domestic violence injunction from possessing a firearm.[2]
¶ 2 The circuit court dismissed Daniel's complaint against Armslist in its entirety, based on the federal Communications Decency Act of 1996 ("the Act"). See 47 U.S.C. § 230(c)(1) and (e)(3) (October, 1998). As pertinent here, the Act creates what Armslist argues is immunity from any "liability" that "may be imposed under any State or local law" for a "provider"
*247 of "an interactive computer service" under a theory of liability that "treat[s]" the provider "as the publisher or speaker of any information provided by another information content provider." See id . The court concluded that Armslist has immunity under this provision of the Act because Daniel alleges only that Armslist "passively displays content that [was] created entirely by third parties" and "simply maintain[ed] neutral policies prohibiting or eliminating certain content," and because Daniel "fails to allege facts which establish ... that Armslist [was] materially engaged in creating or developing the illegal content on its page."
¶ 3 We reverse the order dismissing the complaint as to the Armslist defendants. Applying a plain language interpretation to the Act, we agree with Daniel that the allegations in the complaint, which are that Armslist used website design features to facilitate illegal firearms purchases, do not seek to hold Armslist liable on a theory prohibited by the Act. Stated in the terms used in the Act, we conclude that the allegations do not seek to hold Armslist liable under a theory of liability that "treat[s]" Armslist "as the publisher or speaker of any information provided by another information content provider," which is the protection at issue here that the Act provides. We reject Armslist's argument because the Act provides immunity to website operators, such as Armslist, only when the allegations treat the website as the publisher or speaker of third-party content, and the Act does not protect a website operator from liability that arises from its own conduct in facilitating user activity, as is the case here.
¶ 4 There is a separate issue, which does not involve immunity under the Act, namely, the court's dismissal of a claim of negligence per se. On this issue, *248 we agree with Daniel that, as Armslist effectively concedes, the circuit court erred in dismissing this claim.
¶ 5 Accordingly, we reverse dismissal of the complaint as to the Armslist defendants, including the dismissal of the negligence per se claim, and remand.
BACKGROUND
¶ 6 The following are facts that are alleged or which reasonably can be inferred from the complaint in favor of Daniel. As discussed below, we must accept the facts *215 and reasonable inferences as true for purposes of this appeal.
Allegations Relating To Firearms Sales In General
¶ 7 Federally licensed firearms dealers are required to access and consider certain background information regarding potential buyers in order to prevent sales to individuals prohibited by law from possessing firearms. See WIS. STAT. § 175.35(2) (2015-16); 18 U.S.C. § 922(t)(1).[3] It is unlawful to sell a firearm to certain persons, including those who have domestic abuse injunctions entered against them. See WIS. STAT. § 941.29(4) ; 18 U.S.C. § 922(d). We will sometimes refer to firearms sales to persons who are legally prohibited from possessing them as "prohibited sales," and to the purchasers as "prohibited purchasers."
¶ 8 In contrast to federally licensed dealers, unlicensed "private sellers"-meaning persons not "engaged in the business of selling firearms"-are not *249 required under federal law to conduct background checks. We follow the lead of the parties here, consistent with many authorities, in using the phrases "private sellers" and "private sales" to refer to firearms sales by persons who are not engaged in the business of selling firearms and not licensed by the federal government as firearms dealers. Private sales are attractive to potential buyers who fear that they will fail a background check.
¶ 9 To summarize the basics of the allegations, then, private sales without background checks are not per se unlawful but are attractive to prohibited persons, and prohibited persons violate the law by obtaining firearms from anyone.
¶ 10 The complaint further alleges that statistics show that firearms sold through private sales are more frequently transferred to prohibited persons than are firearms transferred in federally licensed sales. Specifically, the complaint alleges that published studies prove that private sellers and prohibited purchasers are attracted to use Armslist.com by its permitted anonymity and its various filtering features, which make it easier for buyers to avoid having to submit to a background check and to minimize the collection of evidence that could be used to hold them accountable for later unlawful acts committed with an identified firearm.
¶ 11 In addition, the complaint alleges that private sales facilitated by online communications have been linked to illegal firearms trafficking, to firearms sales to minors, and to mass casualty shootings. As a result, the complaint alleges, major classified advertising websites, such as eBay, Craigslist, and Amazon.com, prohibit posts seeking to buy or sell firearms.
*250 Allegations Relating To The Armslist.com Website
¶ 12 After several major websites prohibited users from using posts to facilitate firearms transactions, Armslist saw a commercial opening in this area and created Armslist.com. Through the website, potential buyers and sellers contacted one another, either by clicking on a link within the website or by using the contact information provided by the other party through the website.
¶ 13 The complaint alleges that design and operational features of Armslist.com, which we now summarize, affirmatively "encouraged" transactions in which prohibited purchasers acquired firearms:
*216 • Made private sales easy; ability to limit searches. Sellers could indicate on the website whether they were "premium vendors" (i.e. , federally licensed firearms dealers) or instead "private sellers." Potential buyers were allowed to identify preferences for private sellers and to limit their search results to private sellers.
• No flagging of "criminal" or "illegal" content. Users were allowed to "flag" ads to invite "review and policing" by Armslist, and Armslist used these "flags" to delete certain posts and to prohibit certain users from posting on Armslist.com. However, the website expressly prevented users from flagging content as purportedly criminal or illegal.
• Warning against illegality, but no specific legal guidance. Armslist.com contained a warning that users must obey the law and asked users to certify that they would not use the website for "any illegal purpose." However, it provided no guidance on specific laws governing firearm sales or the care that should be used in conducting such sales.
*251 • No registration requirement; flagging of registered accounts. Users were not required to "register" an account with Armslist.com, "thereby encouraging anonymity." Armslist prominently displayed a statement on each post indicating whether the poster had a "registered" or "unregistered" account.
• No buyer restrictions; no waiting period for private sales. "Armslist does not contain any restrictions for prospective buyers, and its website is designed to enable buyers to evade state waiting period and other legal requirements." This "waiting period" reference is based on a Wisconsin law, in place at the time of the Linn-Radcliffe transaction, that required federally licensed firearms dealers to wait 48 hours after receiving a "proceed" response from the background check system before transferring the firearm, while private sales were not subject to this requirement.
¶ 14 In contrast, the complaint alleges, a different website for firearms transactions requires its users to register before buying a firearm and to take delivery only through a licensed dealer, which greatly minimizes the chances of firearms transfers to prohibited persons.
¶ 15 The complaint includes the allegation that "the average number of want ads specifically asking to buy from a private seller on Armslist[.com] is 240% higher in states that do not require background checks on those sales as compared to states that require [background] checks on private, stranger-to-stranger sales." In particular Wisconsin, which did not require a background check for a private sale, "had the fifth highest number of Armslist[.com] want ads seeking to buy from private sellers."
*252 ¶ 16 The complaint cites a report that allegedly concludes that 54 percent of Armslist.com users selling firearms are willing to sell to a person they believe could not pass a background check, and 67 percent of private online sellers in Wisconsin are willing to sell to a person they believe could not pass a background check.
¶ 17 In sum, Daniel's theory of liability is that, through its design and operation of website features, Armslist's actions were a cause of the injuries to Daniel.
Allegations Relating To The Firearm Sale To Radcliffe
¶ 18 The complaint alleges that police arrested Radcliffe after he assaulted Zina in their home, then confronted her with a *217 knife in the parking lot of the salon where she worked, and slashed the tires of her car. Zina successfully sought an injunction from a circuit court that prohibited Radcliffe from contacting Zina and from possessing a firearm for four years. This made Radcliffe a prohibited person under state and federal law. See WIS. STAT. § 941.29(1m)(f) ; 18 U.S.C. § 922(g)(8).
¶ 19 Thereafter, Radcliffe searched for a firearm to buy, exclusively using Armslist.com. Radcliffe used an Armslist.com function that allowed him to exclude licensed dealers in his search. Radcliffe found a post by private seller Devin Linn that offered a semiautomatic handgun and three high-capacity magazines for sale. Radcliffe arranged, through communications with Linn on the website, to buy the firearm and ammunition in an all-cash transaction with Linn in a fast food restaurant parking lot. The next day, Radcliffe used *253 this firearm and ammunition to fatally shoot four people, including Zina and himself, and to wound four others.
¶ 20 Daniel alleges multiple state law causes of action against the Armslist defendants, each arising from the allegations summarized above.[4] The circuit court granted a motion to dismiss filed by the Armslist defendants on the ground that the Act bars Daniel's claims against the Armslist defendants. Separately, *254 the circuit court dismissed the negligence per se claim based on a 1979 decision of this court. Daniel appeals.
DISCUSSION
¶ 21 The primary issue presented is whether Daniel's claims fail on Armslist's motion to dismiss because the Armslist defendants are immune from liability for state law claims under the federal Communications Decency Act. Before addressing the primary issue, we briefly address a separate circuit court decision, namely, to dismiss one cause of action, negligence per se, which we conclude was an error resulting from a misapplication of case law. See State v.Walker , 2008 WI 34, ¶ 13, 308 Wis. 2d 666, 747 N.W.2d 673 (applications of case law present questions of law that are reviewed de novo on appeal).
¶ 22 The circuit court applied a 1979 decision of this court to dismiss the negligence per se claim. That case, *218 Olson v. Ratzel , 89 Wis. 2d 227, 238, 244-250, 278 N.W.2d 238 (Ct. App. 1979), arguably supports the circuit court's decision, because it explains that, while the general rule is that a violation of a criminal statute is negligence per se, various factors created reasonable doubt that criminal statutes involving firearms handling or possession could constitute negligence per se. Regardless whether Olson supports the circuit court's decision, Daniel correctly points out that the portion of the opinion that the circuit court relied on is no longer the law, if it ever was. Our supreme court, in 1951 and again in 1984, has stated unambiguously that the following is the "rule" in Wisconsin: " 'one who violates a criminal statute must be held negligent per se in a civil action for damages based on such violation.' " *255 See Bennett v. Larsen Co. , 118 Wis. 2d 681, 692-93, 348 N.W.2d 540 (1984) (quoting McAleavy v. Lowe , 259 Wis. 463, 475, 49 N.W.2d 487 (1951) ). Discussion in both McAleavy and Bennett leave no doubt that the court, in each opinion, intended to adopt this broad unqualified rule. And, as Daniel also points out, when a decision of this court conflicts with a decision of the supreme court, the latter controls. See Cook v. Cook , 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997). Moreover, Armslist does not address this Bennett -based argument in its response brief, effectively conceding the point. Accordingly, we reverse the circuit court's decision dismissing the negligence per se claim.
¶ 23 We now turn to the primary issue, immunity under the Act.
Legal Standards
¶ 24 A complaint "fails to state a claim upon which relief may be granted if the defendant is immune from liability for the activity alleged in the complaint." See Energy Complexes, Inc. v. Eau Claire Cty. , 152 Wis. 2d 453, 463, 449 N.W.2d 35 (1989) (citation omitted).[5] Preemption of state law tort liability under the Act can "support a motion to dismiss if *256 the statute's barrier to suit is evident from the face of the complaint." Ricci v. Teamsters Union Local 456 , 781 F.3d 25, 28 (2d Cir. 2015).
¶ 25 Our standard of review and the substantive standard for consideration of a motion to dismiss for failure to state a claim for which relief may be granted are well established:
Whether a complaint states a claim upon which relief can be granted is a question of law for our independent review;....
When we review a motion to dismiss, factual allegations in the complaint are accepted as true for purposes of our review....
....
"A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint." Upon a motion to dismiss, we accept as true all facts well-pleaded in the complaint and the reasonable inferences therefrom.
Data Key Partners v. Permira Advisers LLC , 2014 WI 86, ¶¶ 17-19, 356 Wis. 2d 665, 849 N.W.2d 693 (citations omitted). Thus, here we must accept all allegations of the complaint as true, and we look to the face of the complaint to determine whether a motion to dismiss is warranted *219 based on the pertinent provisions of the Act.
¶ 26 "[S]tatutory interpretation 'begins with the language of the statute.' " State ex rel. Kalal v. Circuit Court for Dane Cty. , 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoted source omitted). "If the meaning of the statute is plain, we ordinarily stop the *257 inquiry." Id. We interpret a statute "in the context in which it is used; not in isolation but as part of a whole." Id. , ¶ 46.
Analysis
¶ 27 We begin with two general observations. First, our task has been complicated, as we think was also the case for the circuit court, by the fact that the parties fail to provide us with developed arguments directly addressing the language of the Act. While both sides reference statutory language and Daniel makes brief attempts to analyze it, both sides primarily base their arguments on their interpretations of case law from other jurisdictions addressing the Act. Because this case presents an issue of first impression in Wisconsin and there is no guidance from the United States Supreme Court, our focus is on the language of the Act as it applies to Daniel's specific allegations. As explained below, we apply a plain meaning interpretation. While our interpretation of the Act is consistent with some of the authority the parties discuss, the case law that Armslist relies on does not significantly aid in the analysis, as discussed below.[6]
¶ 28 Our second observation is that the issue here is not whether Daniel sufficiently alleges negligence or any other claim in the complaint. The sole and *258 limited issue is whether the complaint seeks to hold Armslist liable on a basis prohibited by the Act. As we explain, the pertinent language in the Act prohibits only theories of liability that treat Armslist as the publisher or speaker of the content of Linn's or Radcliffe's posts on the website, and we conclude that the complaint here relies on no such theory.
¶ 29 Having provided those general observations, we now briefly quote the key provisions of the Act, then summarize the arguments of the parties, before turning to the details of the Act, including our interpretation of the Act's pertinent provisions and our conclusion that, with respect to the allegations in the complaint, the Act does not apply to confer immunity.
¶ 30 The following are the key provisions of the Act: (1) "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1) ; and (2) "[n]o cause of action may be brought and no liability may be *220 imposed under any State or local law that is inconsistent with [ § 230 ]." 47 U.S.C. § 230(e)(3). We will sometimes call the first clause the shall-not-be-treated clause and the second the immunity clause, while generally using the term "the Act" to refer to their combined meaning.
¶ 31 We begin, briefly, with the meaning of the immunity clause. Its wording is unambiguous for current purposes and provides for immunity ("no cause of action may be brought and no liability may be imposed") if the conditions of the shall-not-be-treated clause are met. Daniel does not argue to the contrary.
¶ 32 We turn to the shall-not-be-treated clause, beginning with the topic of interpretative rules that we are to use to determine the scope of the immunity it *259 provides. Daniel makes an argument, to which Armslist does not respond, based on a presumption against preemption doctrine. We agree with Daniel that this doctrine applies here to create an exacting standard in determining the scope of immunity.
¶ 33 Explaining further, even where, as here, Congress has expressly provided for some degree of preemption of state law, when courts seek to "identify the domain expressly pre-empted," we are to apply a "presumption against preemption." Medtronic, Inc. v. Lohr , 518 U.S. 470, 484, 494, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). In other words, the existence of an express federal preemption provision (as reflected in the immunity clause here) "does not immediately end the inquiry because the question of the substance and scope of Congress'[s] displacement of state law still remains." Altria Grp., Inc. v. Good , 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008). Moreover, when Congress legislates in a field traditionally occupied by the states (as here, by creating immunity from state tort actions under a specified circumstance), courts are to assume that powers historically exercised by the states are " 'not to be superseded by the Federal Act unless that [was] the clear and manifest purpose of Congress.' " Id. at 77, 129 S.Ct. 538 (quoted source omitted); see also Gregory v. Ashcroft , 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("[I]t is incumbent upon the [ ] courts to be certain of Congress'[s] intent before finding that federal law overrides" the usual constitutional balance of federal and state powers.) (quoted source omitted). After Daniel asks us to apply this doctrine, Armslist has no response. Indeed, the word preemption does not appear in Armslist's briefing. Thus, we proceed with our analysis bearing in mind the presumption against preemption.
*260 ¶ 34 Armslist relies on case law that effectively construes the Act to provide "broad immunity" for claims that rest on allegations of activities by creators and operators of websites that those courts deem to be "publishing" activities. Armslist contends that, under the construction of the Act found in this case law, protected publishing activities include the allegations here involving design and operation of Armslist's website. As we discuss more fully below, Armslist quotes case law that employs terminology not found in the Act and interprets the Act to provide immunity to websites whenever they act as "platforms" for the speech of third parties or whenever they exercise "editorial functions." Based on this case law authority, Armslist argues, the complaint must be dismissed, because it seeks to hold Armslist liable for the publishing activities of using design and operation features of its website to encourage the type of third-party information content that caused the harm at issue.
¶ 35 For her part, Daniel points to case law that more narrowly construes the Act. She contends that her theory of liability against Armslist does not treat Armslist as the speaker or publisher of information content provided by Linn and Radcliffe through Armslist.com, but instead is based on a separate theory of liability. To repeat, Daniel argues, and the complaint alleges, that Armslist is liable for designing and operating its website in a way that encouraged prohibited sales, which she contends was a substantial factor in causing the shootings. These design and operational *221 features allegedly encouraged "private, anonymous, illegal gun purchases," such as Radcliffe's purchase from Linn, which "enabled [Radcliffe] to circumvent" a then-operative Wisconsin law mandating a 48-hour waiting period for federally licensed *261 sales. The theory of liability, then, is that Armslist designed and operated Armslist.com so as to be a cause of the injuries alleged in the complaint.
¶ 36 We do not consider Armslist's case-law-based arguments to be persuasive, because the cases Armslist relies on do not, in our view, come to grips with the plain language in the Act. Rather, we agree with Daniel's argument that her theory of liability is not covered by the shall-not-be-treated clause in the Act, because her liability theory is not based on treating Armslist as the publisher or speaker of information content created by third parties.
¶ 37 In order to explain that conclusion, we now walk through in more detail the provisions in the shall-not-be-treated clause: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." See 47 U.S.C. § 230(c)(1).
¶ 38 There is no dispute that Armslist.com was an "interactive computer service" provider. The Act defines the phrase "interactive computer service" expansively: "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2).
¶ 39 The Act does not define the phrase, "shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The terms "publisher" and "speaker" do not appear to have any specialized or technical meaning, but they are without doubt directly linked with the phrase "of any information." For this *262 reason, we conclude that the only reasonable interpretation of this language is that it is a reference to the specific act of publishing or speaking particular information, namely, information provided by another information content provider. We do not see any distinction that could matter, at least in the context of this case, between being treated as "the publisher" of information and being treated as "the speaker" of information. It appears that the terms publisher and speaker are both used simply to convey the notion that liability may not be based on treating a provider as the disseminator or propagator of the described information.
¶ 40 This brings us to the last pertinent phrase in the shall-not-be-treated clause: "provided by another information content provider." 47 U.S.C. § 230(c)(1). The Act defines "information content provider" broadly as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3). We perceive no dispute that Linn and Radcliffe, when they allegedly used the website to initiate and conduct portions of their transaction, were each "another information content provider."
¶ 41 Pulling together these observations, we can see that, in order to prevail, Armslist must show that the claims here treat Armslist as liable because it is an entity that published or spoke information provided by Linn or Radcliffe, and Armslist must overcome the presumption against preemption.[7] Armslist makes no *263 such *222 showing. Armslist points to nothing in the complaint that attempts to hold Armslist liable as a publisher or speaker of the content provided by Radcliffe and Linn. Instead, Armslist contends that the Act protects the activity of designing and operating a website, but without tying this interpretation to language in the Act. Stated differently, Armslist effectively ignores the Act's phrase "publisher or speaker of any information provided by another."
¶ 42 If the goal of Congress were to establish the sort of broad immunity urged by Armslist, that is, immunity for all actions of websites that could be characterized as publishing activities or editorial functions, Congress could have used any number of formulations to that end. Instead, Congress limited immunity to a single circumstance: when a theory of liability treats the website creator or operator "as the publisher or speaker of any information provided by another information content provider." Nothing in this language speaks more generally to website design and operation.
¶ 43 As noted above, Armslist's argument consists almost entirely of strings of references to authority that it considers persuasive. We address case law below. But first, we address what we understand to be the minimal argument Armslist makes that is not tied to case law.
¶ 44 Armslist contends that "all of [the] ... alleged website defects are content-based, related either *264 to the way information is presented on the site or to who is allowed to use it." It may be fair to characterize all of the operational and design features alleged by Daniel to be in some sense "content-based." However, in this respect, the content is not "information provided by another information content provider." Rather, it is content created by Armslist, and there is no language in the Act immunizing Armslist from liability based on content that it creates.
¶ 45 Our interpretation of the Act is consistent with authority that we consider to be persuasive. See Barnes v. Yahoo!, Inc. , 570 F.3d 1096, 1100, 1105 (9th Cir. 2009) ("[l]ooking at the text [of the Act], it appears clear that [it does not] declare[ ] a general immunity from liability deriving from third-party content.... It is the language of the statute that defines and enacts the concerns and aims of Congress; a particular concern does not rewrite the language."); Doe v. Internet Brands, Inc. , 824 F.3d 846, 853 (9th Cir. 2016) (cautioning against applying the Act "beyond its narrow language and its purpose." "Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet" even when a claim "might have a marginal chilling effect on internet publishing businesses."). As Barnes explains, courts are to consider "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." Barnes , 570 F.3d at 1102.
¶ 46 We note in particular the opinion of the Washington Supreme Court in J.S. v. Village Voice Media Holdings, L.L.C. , 184 Wash.2d 95, 359 P.3d 714 (2015). In J.S. , the majority concluded that allegations that the website at issue developed and posted guidelines and *265 content rules that facilitated child prostitution were sufficient to withstand a motion to dismiss based on the Act. 359 P.3d at 717-18. In a concurring *223 opinion, Justice Wiggins summarizes the position of courts that have "specifically rejected the subsection 230(c)(1) defense when the underlying cause of action does not treat the information content provider as a 'publisher or speaker' of another's information." Id. at 723-24 (Wiggins, J., concurring). Opinions cited by J. Wiggins include City of Chicago, Ill. v. StubHub!, Inc. , 624 F.3d 363, 365, 366 (7th Cir. 2010) (online broker could be liable for unpaid taxes on sales of tickets listed by users because liability did not depend on who " 'publishes' any information or is a 'speaker' " unlike claims "for defamation, obscenity, or copyright infringement."), and Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC , 521 F.3d 1157, 1164 (9th Cir. 2008) (" 'The Communications Decency Act was not meant to create a lawless no-man's-land on the Internet.' ").
¶ 47 We note that our interpretation of the Act does not deprive it of value to defendants in tort cases, but instead provides concrete, if narrow, immunity. For example, websites cannot be held liable under the Act merely because they allow the posting of third-party defamatory comments, because that would treat the websites as the publishers or speakers of the comments. See Internet Brands, Inc. , 824 F.3d at 851 (defamation provides a "clear illustration" of the intent of the shall-not-be-treated clause).
¶ 48 It follows from what we have said that we do not consider persuasive case law, cited by Armslist, that has interpreted the Act in arguably analogous situations to this case to confer immunity based on *266 "publishing" activities of website operators.[8] We believe that the cases cited by Armslist are effectively reading into the Act language that is not present, to the effect that the Act provides general immunity for all activities that consist of designing or operating a website that includes content from others. See, e.g., Jane Doe No. 1 v. Backpage.com, LLC , 817 F.3d 12, 18 (1st Cir. 2016) (Act conferred immunity on Backpage.com against liability for sex trafficking-related claims, because the allegations relied on the website's actions as designer and operator of a website providing a forum for publishing information content posted by third parties, rather than as an information content provider itself or as an encourager of prohibited activity); Herrick v. Grindr, LLC , 306 F. Supp. 3d. 579, 589, 2018 WL 566457, at *5 (S.D.N.Y. Jan. 25, 2018) (Act conferred immunity on interactive computer service because it "may not be held liable for so-called 'neutral assistance,' [which involves providing] tools and functionality that are available equally to bad actors"; explaining that design and "[c]ategorization features," such as a drop-down menu, "constitute quintessential 'neutral assistance.' ") (quoted sources omitted).
¶ 49 Some such courts have interpreted the Act to provide immunity for each activity of website creators or operators that could be characterized as being one of "a publisher's traditional editorial functions." See Zeran v. America Online, Inc. , 129 F.3d 327, 330-31 (4th Cir. 1997) ; see also *267 Backpage.com , 817 F.3d at 21. This is sometimes stated in terms of immunity for activity involving mere "neutral means" of allowing users to post on websites, and sometimes in terms of protection for "passive" conduct by the website. See Klayman v. Zuckerberg , 753 F.3d 1354, 1358 (D.C. Cir. 2014) (interpreting the Act to hold *224 that "a website does not create or develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online" and has immunity from liability for providing this "neutral means"); Roommates.com , 521 F.3d at 1173-74 (online marketplace provider "is not responsible, in whole or in part, for the development of ... content[ ] which comes entirely from subscribers and is passively displayed by" the website).
¶ 50 Simply put, we are unable to tie these case-law applications to the Act's specific language and, for that reason, do not find the cases Armslist relies on helpful.
¶ 51 Moreover, the weakness of Armslist's argument is all the more glaring in light of the presumption against preemption that we address at ¶¶ 32-33 supra . To repeat, the Act uses the narrow terms we have addressed, while the cases cited by Armslist effectively ignore the terms of the Act. Instead, these opinions essentially collapse the entire analysis into a broad and unsupported definition of "publisher." The Act does not, for example, provide lists of website features that do or do not represent traditional editorial functions, nor does it use the terms "neutral" or "passive" or any similar terms. This leaves courts without principled and consistent ways to define "traditional editorial functions," "neutral means," or "passive display." We cannot lightly presume that Congress would intend that the highly consequential immunity determination *268 could turn on how courts might choose to characterize website features as being more or less like traditional editorial functions, or more or less neutral or passive, especially without reasonably specific statutory direction or guidelines.
¶ 52 In sum, the Act, and in particular the shall-not-be-treated clause, does not immunize Armslist from claims in the complaint because the claims and the supporting allegations do not seek to hold Armslist liable for publishing another's information content. Instead, the claims seek to hold Armslist liable for its own alleged actions in designing and operating its website in ways that caused injuries to Daniel.
CONCLUSION
¶ 53 For all of these reasons, we conclude that the circuit court erred in dismissing the negligence per se claim and separately conclude that the Act does not preempt state law to provide immunity to the defendants. Accordingly, we reverse the circuit court order dismissing the complaint against the Armslist defendants and remand the cause.
By the Court. -Order reversed and cause remanded.

Yasmeen Daniel brought this action both individually and as administrator of the estate of Zina Daniel Haughton. We refer to her in both capacities as "Daniel." Daniel also brought claims against Radcliffe's estate and the person who sold the gun and ammunition to Radcliffe. We do not address those claims in this appeal.
Separately, we note that Daniel has also sued two members of Armslist, LLC. We will refer to the LLC and its two members as "Armslist" or the "Armslist defendants." For purposes of this appeal neither side suggests that there is any potential difference in liability among Armslist defendants, and we generally treat them in an identical manner. Our decision reversing dismissal of the complaint applies to all Armslist defendants.

We refer to Radcliffe and Zina by their first names because they shared a last name.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted. All references to the United States Code are to the current version unless otherwise noted.

Briefly in the text and in the second paragraph of this footnote we address two specific claims. We address a negligence per se claim later in the text and we address a claim based on alter-ego liability in the next paragraph of this footnote. Otherwise, however, we need not separately address the tort claims in Daniel's complaint, because Armslist does not argue that we should distinguish among the claims in resolving the primary issue involving potential immunity under the Act.
Regarding Daniel's request to pierce the corporate veil of Armslist, LLC, through a claim based on alter-ego liability, we interpret the circuit court to have responded to Armslist's request to dismiss this claim by indicating that the request was premature. The court noted that there could be no grounds to pierce the corporate veil before Daniel first obtains a judgment against Armslist, LLC, in this case, which may not come to pass. At least based on the limited briefing with which we have been provided, this issue does not appear ripe, and we do not address this topic further.
One additional note on the status of claims and parties. Our holding that there is no immunity under the Act based on the allegations in the complaint reverses the circuit court's ruling, if it was intended as such, that individual defendants Mancini and Gibbon must be dismissed from the complaint. However, we interpret the court to have stated only that the individual defendants should be dismissed for the same reason that the complaint should be dismissed, based on immunity under the Act, and Armslist takes a position consistent with this interpretation. Because we hold that the Act does not apply, Mancini and Gibbon remain in the case at this juncture.

At least one court has questioned whether it is appropriate to use the term "immunity" in connection with the Act. See Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc. , 519 F.3d 666, 669-70 (7th Cir. 2008). But Armslist has raised the affirmative defense of "immunity" in support of its motion to dismiss, and both parties on appeal use the term without qualification. We see no problem in using the term "immunity" to describe the result that Armslist seeks under the Act, so long as the term is correctly limited to the narrow scope of immunity dictated by the language of the Act.

Because there appears to be no United States Supreme Court or Supreme Court of Wisconsin interpretation of the pertinent provisions of the Act, we consider the persuasive value of authority from various federal and state courts, some of which we summarize below, which have interpreted the Act's pertinent provisions in other cases involving similar allegations. See Klein v. Board of Regents, Univ. of Wisconsin Sys. , 2003 WI App 118, ¶ 13, 265 Wis. 2d 543, 666 N.W.2d 67 ("we are bound only by the opinions of the United States Supreme Court on questions of federal law") (citation omitted).

At least at a general level, this formulation is consistent with one used by federal circuit courts of appeal, namely, that the Act provides immunity if the following criteria are met: (1) the defendant "is a 'provider or user of an interactive computer service'; (2) the plaintiff's claim is based on 'information provided by another information content provider'; and (3) the claim would treat [the defendant] 'as the publisher or speaker' of that information." See, e.g., Universal Commc'n Sys., Inc. v. Lycos, Inc. , 478 F.3d 413, 418 (1st Cir. 2007) (quoting 47 U.S.C. § 230(c)(1) ).

Armslist incorrectly asserts that the circuit court's ruling here was consistent with "virtually every court in the United States." Having said that, we recognize that there is divided authority on how to interpret the pertinent language of the Act, which addresses activities in the context of relatively new and evolving technologies.