ANN WALSH BRADLEY, J. (dissenting).
*485 ¶60 The majority views Daniel's complaint as merely "artful pleading," disguising her true claims against Armslist. By using the phrase "artful pleading," the majority implicitly acknowledges that the language of the complaint states a claim. In essence, it posits, "I know that's what it says, but that's not what it really means."
¶61 What the majority would call "artful pleading," I would instead call the plain language of the complaint-which at this stage of the proceedings, the law mandates we accept as true.[1]
¶62 The complaint alleges that Zina Daniel Haughton sought and received a restraining order against her husband, Radcliffe Haughton, after he assaulted her and threatened her life. Majority op., ¶3. Pursuant to the restraining order, Radcliffe was prohibited from owning a firearm for a period of four years. Id.; see Wis. Stat. § 941.29(1m)(f).[2]
¶63 Within two days Radcliffe had a gun in his hands. See Majority op., ¶3. And within three days, Radcliffe went to Zina's place of employment, and in front of her daughter, shot and killed Zina. He also *486 murdered two other people, injured four others, and then shot and killed himself. Id., ¶4.
¶64 Radcliffe quickly and easily, without undergoing the inconvenience of a federal background check, procured a gun using a website designed by Armslist. The complaint avers that Armslist designed its website with the specific purpose of skirting federal gun laws.
¶65 Nevertheless, the majority allows Armslist to hide behind the Communications *728 Decency Act (CDA), which affords immunity to websites if a plaintiff's claims treat the website "as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The allegations here, however, assert liability for Armslist not based on content provided by another. Rather, the allegations assert liability based on design content Armslist alone created.
¶66 In my view, the majority errs in its interpretation of the CDA by basing its decision not on the actual claims pled in the complaint but on its own manufactured interpretation of those claims. As a result, it fails to recognize that here the design itself is the creation of content.[3] Accordingly, I respectfully dissent.
I
¶67 The complaint alleges that Radcliffe was hastily able to procure this gun by using Armslist.com, a website that serves as an online marketplace for *487 firearms. Majority op., ¶¶1, 3. He focused his search for a gun exclusively on Armslist "because he knew that he could not acquire a firearm from a licensed dealer or from a private seller in his community who knew him, and that any contact with a legitimate seller could result in his plan of illegally purchasing a firearm being revealed to law enforcement authorities."
¶68 Importantly, unlicensed private sellers are not required under federal law to conduct background checks on individuals attempting to purchase firearms. See 18 U.S.C. §§ 922(t) ; 18 U.S.C. § 923(a). Allowing and encouraging prohibited purchasers like Radcliffe to circumvent the laws governing licensed firearm dealers, Armslist incorporated a search function that allows potential gun buyers to exclude licensed dealers from their queries.
¶69 The day after the issuance of the restraining order against him, Radcliffe took action to accomplish his goal. After seeing on Armslist an advertisement for an FNP-40 semiautomatic handgun and three high-capacity magazines of ammunition, Radcliffe contacted the seller of the items, Devin Linn, using Armslist's "contact" function. The gun was listed for $ 500, a cost higher than what would have been paid by a legitimate buyer for the same weapon and ammunition. Radcliffe advised Linn in a phone call that "he needed the firearm as soon as possible."
¶70 Consistent with Radcliffe's desire for a fast transaction, he and Linn met the following morning. Linn handed over the gun and ammunition, no questions asked. Despite erratic behavior on Radcliffe's part, Linn sold Radcliffe the weapon without determining whether he was a felon, whether he was subject to *488 a restraining order or whether he had been adjudicated mentally ill. He made no inquiry whatsoever.
¶71 After Radcliffe took the weapon he purchased from Linn and used it to kill Zina and two other people, Zina's daughter Yasmeen Daniel brought this lawsuit. The theory of liability advanced focused on Armslist's conduct: "the Armslist Defendants designed Armslist.com specifically to exploit and profit from the background check exception for private sellers, to enable the sale of firearms to prohibited and otherwise dangerous people, and to enable illegal firearm sales, including sales that avoid federal restrictions on interstate *729 transfers, state-imposed waiting periods, and state-specific assault weapon restrictions."
¶72 Daniel further alleged that "[t]he Armslist Defendants knew, or should have known, that the design and architecture of Armslist.com creates a near-certainty that prohibited purchasers will use the marketplace to buy firearms, and that the marketplace will be used for illegal gun sales, including by unlicensed individuals that are engaged in the business of selling firearms." In Daniel's estimation, Armslist breached its duty to the public by "[d]esigning Armslist.com to facilitate sales to prohibited purchasers, such as Radcliffe Haughton."
¶73 Armslist moved to dismiss the claims against it based on CDA immunity. The circuit court granted the motion to dismiss and the court of appeals unanimously reversed.
¶74 Now reversing the court of appeals, the majority determines that Armslist is immune from Daniel's claims pursuant to the CDA. Majority op., ¶2. In the majority's view, "all of Daniel's claims for relief require Armslist to be treated as the publisher or speaker of information posted by third parties ...,"
*489 entitling it to CDA immunity. Id. It further opines that "Daniel's negligence claim is simply another way of claiming that Armslist is liable for publishing third-party firearm advertisements and for failing to properly screen who may access this content." Id., ¶51.
II
¶75 This case presents a discrete question of statutory interpretation. As the court of appeals in this case correctly stated, "[t]he sole and limited issue is whether the complaint seeks to hold Armslist liable on a basis prohibited by the Act." Daniel v. Armslist, LLC, 2018 WI App 32, ¶ 28, 382 Wis. 2d 241, 913 N.W.2d 211.
¶76 The statute at issue is the CDA, 47 U.S.C. § 230(c)(1), which provides: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."
¶77 Another nearby provision states the preemptive effect of the CDA: "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). The CDA is a purveyor of immunity, but it "was not meant to create a lawless no-man's-land on the Internet." Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157, 1164 (9th Cir. 2008).
¶78 Our inquiry is limited to whether the plaintiff's theory of liability (that Armslist designed its website to facilitate illegal gun purchases) treats Armslist as the speaker or publisher of Linn's and Radcliffe's posted advertisements. The court of appeals, *490 subscribing to a plain language interpretation of the CDA, concluded that "Congress limited immunity to a single circumstance: when a theory of liability treats the website creator or operator 'as the publisher or speaker of any information provided by another information content provider.' Nothing in this language speaks more generally to website design and operation." Daniel, 382 Wis. 2d 241, ¶ 42, 913 N.W.2d 211.
¶79 In the court of appeals' view, the content for which Daniel seeks liability "is not 'information provided by another information content provider.' Rather, it is content created by Armslist, and there is no language in the Act immunizing Armslist from liability based on content that it creates." Id., ¶ 44.
*730 ¶80 I agree with the court of appeals' unanimous determination. A close reading of Daniel's complaint indicates that the complaint is not seeking to hold Armslist liable for any content created by a third party. The complaint does not allege that Armslist is liable due to the advertisements posted by Radcliffe and Linn. Instead, it alleges that Armslist is liable for its own content, i.e. the design and search functionality of its website.
¶81 "Where it is very clear that the website directly participates in developing the alleged illegality ... immunity will be lost." Fair Hous. Council, 521 F.3d at 1174. Such is the allegation here.
¶82 As the court of appeals observed, this conclusion is supported by the Washington Supreme Court's interpretation of the CDA in J.S. v. Village Voice Media Holdings, LLC, 184 Wash.2d 95, 359 P.3d 714 (2015). In J.S., a victim of sex trafficking filed suit against Backpage, a website that allowed hosted advertisements offering sexual services. Id., ¶¶ 2-3. She alleged that the website "is not immune from suit in part *491 because its advertisement posting rules were 'designed to help pimps develop advertisements that can evade the unwanted attention of law enforcement, while still conveying the illegal message.' " Id., ¶ 3.
¶83 The J.S. court observed that its determination "turns on whether Backpage merely hosted the advertisements that featured J.S., in which case Backpage is protected by CDA immunity, or whether Backpage also helped develop the content of those advertisements, in which case Backpage is not protected by CDA immunity." Id., ¶ 11. Backpage moved to dismiss, claiming CDA immunity, but the court allowed J.S.'s claims to proceed.
¶84 In doing so, the J.S. court examined the allegations of the complaint, and taking them as true, determined that they "would show Backpage did more than simply maintain neutral policies prohibiting or limiting certain content." Id., ¶ 12.[4] Following the same mode of analysis here, Armslist is not entitled to CDA immunity.
*492 ¶85 Specifically, Daniel alleges in her complaint that "[o]ne of the most prominent features of Armslist's search function is the ability to search for only private sellers, thereby eliminating from search results any sellers required to perform a background check." No one but Armslist is alleged to be responsible for this feature.
¶86 Daniel further asserts that this feature was intentionally created "specifically to exploit and profit from the background check exception for private sellers, to enable the sale of firearms to prohibited and otherwise dangerous people, and to enable illegal firearm sales, including sales that avoid federal restrictions on interstate transfers, state-imposed waiting periods, *731 and state-specific assault weapon restrictions." Again, no one but Armslist is alleged to be responsible for this design.[5]
¶87 The majority contends that "all of Daniel's claims for relief require Armslist to be treated as the *493 publisher or speaker of information posted by third parties...." Majority op., ¶2. Further, the majority claims that its decision "prevents plaintiffs from using 'artful pleading' to state their claims only in terms of the interactive computer service provider's own actions, when the underlying basis for liability is unlawful third-party content published by the defendant." Majority op., ¶43.
¶88 But the majority's approach requires the court to ignore the literal words used in the complaint. In its endeavor to brand Daniel's complaint as "artful pleading," it ties itself in knots to avoid the actual claims Daniel makes.
¶89 Such an approach deviates from established practice that plaintiffs are the masters of their complaints. See Caterpillar, Inc. v. Williams, 482 U.S. 386, 398-99, 107 S. Ct. 2425, 96 L.Ed.2d 318 (1987). Rather than applying the complaint's plain language, the majority manufactures an interpretation. Embarking upon a legally unsupportable approach, it fails to recognize that here the design itself is content and ignores the distinction between first-party created content and third-party created content.
¶90 The complaint sets forth that Daniel is seeking liability against Armslist for Armslist's conduct only. We should take the complaint at face value.[6] Accordingly, Armslist is not entitled to CDA immunity.
*494 ¶91 For the foregoing reasons, I respectfully dissent.

For purposes of our review, we must accept the allegations of Daniel's complaint as true. PRN Assocs. LLC v. State, DOA, 2009 WI 53, ¶ 27, 317 Wis. 2d 656, 766 N.W.2d 559 ; see Meyers v. Bayer AG, Bayer Corp., 2007 WI 99, ¶ 81, 303 Wis. 2d 295, 735 N.W.2d 448 (Roggensack, J., dissenting) (citation omitted).

Wis. Stat. § 941.29(1m)(f) provides that a person who possesses a firearm is guilty of a Class G felony if "[t]he person is subject to an injunction issued under s. 813.12 or 813.122 ... that includes notice to the respondent that he or she is subject to the requirements and penalties under this section and that has been filed under s. 813.128(3g)."

Examples of design content are ubiquitous. One need look no further than the design content of algorithms, used to influence everything from where we shop to the sentencing of criminals. See State v. Loomis, 2016 WI 68, 371 Wis. 2d 235, 881 N.W.2d 749. The parameters of "content" extend beyond simply words on a page.

The majority's attempt to distinguish and dismiss J.S. is unpersuasive. See majority op., ¶¶48-49. First, the majority fails to explain how using Wisconsin's pleading standard instead of Washington's would change the result. Contrary to the majority's assertion, the J.S. court did not base its determination on any "hypothetical facts." Rather, it took the allegations of the complaint as true, just as we do in Wisconsin. See J.S. v. Village Voice Media Holdings, LLC, 184 Wash.2d 95, 359 P.3d 714, ¶ 12 (2015) ("Viewing J.S.'s allegations in the light most favorable to J.S., as we must at this stage, J.S. alleged facts that, if proved true ..."); Data Key Partners v. Permira Advisers LLC, 2014 WI 86, ¶ 18, 356 Wis. 2d 665, 849 N.W.2d 693 ("When we review a motion to dismiss, factual allegations in the complaint are accepted as true for purposes of our review.").
Second, the J.S. court did not establish an "intent exception" to CDA immunity as the majority claims, but merely recognized a distinction that is manifest in the CDA's text: the distinction between first-party created content and third-party created content. See majority op., ¶49.

Justice Wiggins's concurrence in J.S. is particularly insightful in examining the facts alleged in Daniel's complaint in this case. Narrowly interpreting the CDA, Justice Wiggins wrote:
Plaintiffs do not argue that Backpage.com necessarily induces the posting of unlawful content by merely providing an escort services category. Instead, plaintiffs allege that Backpage.com deliberately designed its posting rules in a manner that would enable pimps to engage in sex trafficking, including in the trafficking of minors, and to avoid law enforcement. These factual allegations do not suggest that Backpage.com is being treated as a "publisher or speaker."
J.S. v. Village Voice Media Holdings, 184 Wash.2d 95, 359 P.3d 714, ¶ 30 (2015) (Wiggins, J., concurring); see also Mary Graw Leary, The Indecency and Injustice of Section 230 of the Communications Decency Act, 41 Harv. J. of Law & Pub. Pol'y 553, 587-591 (2018).

Further, I observe that my conclusion is not at odds with the bulk of CDA jurisprudence. For example, in Zeran v. America Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997), a seminal CDA case, the Fourth Circuit determined that "§ 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions-such as deciding whether to publish, withdraw, postpone or alter content-are barred."
Zeran and its progeny are not disturbed by my conclusion. My analysis and Zeran peacefully coexist because they deal with different factual allegations-liability for third party content vs. liability for first party content.